## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DARRELL R. EWING, et al.,

CASE NO. 2:22-cv-11453

*Plaintiffs*,

Sean F. Cox

*v.*

United States District Judge

WAYNE COUNTY SHERIFF, et al.,

Patricia T. Morris

United States Magistrate Judge

*Defendants*.

_____/

### REPORT AND RECOMMENDATION ON PLAINTIFFS EWING, LITTLEJOHN, RICHARDS, GROOM, AND WILEY'S MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 49) AND PLAINTIFF EWING'S MOTION TO EXPEDITE (ECF No. 134)

I.      **RECOMMENDATION**

For the following reasons, **I RECOMMEND** that the Court **GRANT** Plaintiffs' motion for a preliminary injunction (ECF No. 49) **IN PART** and **DENY** Plaintiff Ewing's Motion to Expedite (ECF No. 134) **AS MOOT**.

If adopted, the Court would enter an injunction requiring the Defendants to allow Ewing to engage in outdoor recreation for a two-hour session at least once per month, and if resources allow, officials must allow Ewing to attend two two-hour sessions per month.

II.      **REPORT**

A.      **Background**

1

This is a civil rights action under 42 U.S.C. § 1983 brought by a group of eleven current and former Wayne County Jail inmates.  (ECF No. 1, PageID.2–4). The plaintiffs filed their original complaint in June 2022, alleging that despite the waning severity of the COVID-19 pandemic, officials at the Wayne County Jail have lagged behind the rest of the world by failing to lift their COVID-19 restrictions. (*Id.* at PageID.5–8).  Specifically, the Plaintiffs accuse the Jail of prohibiting in-person visitation, recreation, and access to "fresh air."  (*Id.*)

Plaintiffs filed their original complaint in June 2022, and before the Court issued summons and directed service the following year, Plaintiffs filed a slew of motions, including several motions for leave to file their first amended complaint. (ECF No. 1; ECF No. 40, PageID.253–54; *e.g.*, ECF Nos. 3–5, 12–13, 16).  The Court accepted the last of these complaints (ECF No. 16) as the operative complaint. (ECF No. 29, PageID.225).  This amended complaint added three new defendants accused of violating the Plaintiffs' rights to speedy trials, and it added a claim accusing jail officials of interfering with their incoming mail by withholding letters for extended periods and sometimes returning letters to their sender without notice. (ECF No. 16, PageID.159–60, 165–68).  Soon after, the Court dismissed the speedy trial claims on its own motion.  (ECF No. 40).

The following month—before any Defendant had either been served or waived service—Plaintiffs renewed their motion for a preliminary injunction and

moved to file their second amended complaint, adding claims against Pamela Rose, Toth, Williams, Crawford, and an unidentified John Doe.  (ECF Nos. 47, 49, 50; *see also* ECF No. 59, PageID.325).  Although only Ewing, Littlejohn, Richards, Groom, and one other Plaintiff (with an illegible signature) signed the second amended complaint, the Court accepted it as the operative complaint.  (ECF No. 50, PageID.307–08; ECF No. 59).  The second amended complaint adds three new claims, alleging that the Defendants (1) "cop[ied] and store[d]" their notarized, legal materials; (2) withheld their "certified trust account statements," and (3) neglected to "implement a system" for inmates to send "priority mail to the courts and attorneys."  (ECF No. 50, PageID.305, ¶¶ 46–48).

Ewing, Littlejohn, Richards, Groom, and Wiley move for preliminary injunctions on all eight claims.  As to their claims that Jail officials withheld adequate recreation and access to "fresh air," they ask for five hours per week of access to exercise equipment such as jump ropes, pull up bars, and kettle bells; weekly access to the outdoors; and the ability to open their cell windows.  (ECF No. 49, PageID.285–86).  They also ask that the Court: order the Defendants to "open" in-person visitation; enjoin the Jail's practice of copying and storing privileged legal materials; require the Defendants to "issue certified trust account statements to be forwarded to the Court" on "request"; and direct the Defendants to establish a "system" for detainees to "e-file[]" and send "priority, disbursement, . . . and

indigent legal mail . . . ." (*Id.* at PageID.286–87).

Further, Plaintiffs request an injunction that would require the Defendants to "establish" both "an incoming legal mail daily logging system," and a "procedure to promptly provide" regular mail, legal mail, and books to the Plaintiffs "in a timely fashion set by the Court . . . ." (*Id.*)  When letters are delivered to the Plaintiffs, they ask that the Defendants be required to log the date of receipt alongside the Plaintiffs' signatures.  (*Id.*)

Each Defendant responded in opposition to the Plaintiffs' motion, and the Plaintiffs later filed a reply brief.[1]  (ECF Nos. 93, 114).  After the parties completed briefing, the Undersigned ordered the Defendants to submit supplemental briefing to clarify whether the Plaintiffs in their custody remained housed in Division II of the Wayne County Jail.  (ECF No. 136).  The Defendants responded the following day, noting that of the eleven plaintiffs only Ewing and Kirksey remained in the Jail's custody.  (ECF No. 138, PageID.806).  Both Plaintiffs, the Jail explained, were housed in Division II of the Jail and had criminal trials scheduled for Spring 2024. (*Id.*; *see also* ECF No. 138-1, PageID.818, 821).  Although the Undersigned allowed the Plaintiffs to respond to the Defendants supplemental brief by January 10 (ECF

---

[1] Every Defendant except for Dunlap has waived service.  (ECF Nos. 56–57, 85–89). Although the record does not indicate whether Dunlap has been properly served, his counsel has filed various motions on his behalf.  (ECF No. 62; *e.g.*, ECF Nos. 81, 93, 113, 119).

No. 136, PageID.781), only Plaintiff Ewing responded. (ECF No. 145.)

**B.    Analysis**

The moving party carries the burden of proving that he or she is entitled to a preliminary injunction. *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009). Because preliminary injunctive relief is an "extraordinary remedy," courts hesitate to grant preliminary injunctive relief and will only do so if an injunction is "clearly" warranted. *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). Moreover, given the "unique nature of a prison setting," where a prisoner moves to enjoin "prison officials, the court is required to proceed with the utmost care and must recognize the unique nature of the prison setting." *Sango v. Wakley*, No. 1:14-cv-703, 2014 WL 3894652, at *2 (W.D. Mich. Aug. 8, 2014) (citing *Glover v. Johnson*, 855 F.2d 277, 284 (6th Cir. 1988)).

When considering whether to issue a preliminary injunction or a TRO, a court must consider four factors: (1) the movant's likelihood of success on the merits, (2) whether the movant "is likely to suffer irreparable harm in the absence of preliminary relief," (3) whether "the balance of equities tips in" the movant's "favor," and (4) whether the "injunction is in the public interest." *Winter v. Nat. Res. Def. Comm'n*, 555 U.S. 7, 20 (2008).

No one factor is controlling, and except for the movant's risk of irreparable injury, no single factor is required to obtain injunctive relief. *Friendship Materials,*

5

*Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102–03 (6th Cir. 1982) (citing *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  Instead, these factors must be "carefully balanced" by the district court.  *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261 1263 (6th Cir. 1985).  Further, although a movant with "no likelihood of success on the merits" generally cannot obtain injunctive relief, a movant need not show an "overwhelming" probability of success on the merits.  *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. Aug. 22, 2000); *Sellers v. U. of Rio Grande*, 838 F. Supp. 2d 677, 679 (S.D. Ohio 2012).

On each claim, the Plaintiffs seek an injunction to avoid an "irreparable injury"; that is, an injury not "fully compensable by monetary damages."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).  Still, on each claim besides their outdoor recreation claim, the remaining factors weigh against the issuance of an injunction.

## 1.    Standing

Before addressing the merits, the Defendants argue that several movants no longer have standing to pursue injunctive relief.  Article III of the United States Constitution grants federal courts only the power to decide "cases" and "controversies."  U.S. Const. art. III, § 2, cl. 1.  In other words, federal courts may only decide "actual, ongoing" disputes between parties.  *Kentucky v. United States*

6

*ex rel. Hagel*, 759 F.3d 588, 595 (6th Cir. 2014). To establish that his or her case is an "actual" justiciable dispute, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by favorable decision'" and the plaintiff's "requested relief." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 659 (6th Cir. 2007). These elements are required not just to bring an action, but also to maintain litigation in federal court. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997). If "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," of a particular claim, then that claim becomes "moot," and the court loses jurisdiction over it. *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *see also Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).

When an inmate is transferred or released from a jail or prison, he or she is no longer subject to that facility's policies. For that reason, inmates generally lose standing to enjoin a facility's policies when they are released or transferred to a different facility. *E.g.*, *Cardinal v. Metrish*, 564 F.3d 794, 798–99 (6th Cir. 2009) (citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)); *accord Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015) ("Jones's RLUIPA claims for injunctive relief

are moot because Jones has been released from custody."); *Martin v. Davies*, 917 F.2d 336, 339 (7th Cir. 1990).

Of the five movants here—Ewing, Littlejohn, Richard, Groom, and Wiley— all but Ewing have been released from the Jail and thus no longer have standing to pursue injunctive relief.   (ECF No. 74-2, PageID.401, 404; ECF No. 120-1, PageID.753; ECF No. 138-2, PageID.825).   Further, while Kirksey also remains in the Jail's custody, he did not move for injunctive relief and his coplaintiffs may not move for injunctive relief on his behalf.  *Barrows v. Jackson*, 346 U.S. 249, 255 (1953) ("[O]ne may not claim standing . . . to vindicate the constitutional rights of [a] third party.").  Nor, for that matter, may the movants pursue injunctive relief on behalf of any other detainee in the Jail's custody.  *See id.*  (*But see* ECF No. 114, PageID.600–01).  Thus, the Court may only grant injunctive relief to Ewing.[2]

### 2.    Plaintiffs' Evidentiary Support

The Defendants raise one other preliminary issue.  As to Ewing's request for

---

[2] Also moot is Plaintiffs' motion for injunctive relief on their claim that the Defendants infringed their right to access the courts by refusing to provide "certified trust account statements" which the Plaintiffs required to proceed in forma pauperis in this matter.  (ECF No. 50, PageID.305, ¶ 41; *see* ECF No. 27, PageID.212–13).  Although the Jail apparently did not provide trust account statements to the Plaintiffs upon request, "six of the eleven plaintiffs paid their . . . portions of the filing fee" and therefore need not have applied to proceed in forma pauperis.  (ECF No. 27, PageID.213–14).  And the remaining five Plaintiffs were allowed to proceed in forma pauperis despite failing to provide their trust account statements.  (*Id.*)  Thus, an injunction ordering the Defendants to "issue certified trust account statements" could no longer remedy the Plaintiffs' injury.  (ECF No. 49, PageID.287, ¶ 7).

injunctive relief, Defendants argue that the Court may deny his motion without addressing its merits because the Plaintiffs have neglected to support their motion with "any" evidence.   (ECF No. 93, PageID.497).   To be sure, movants for a preliminary injunction must present evidence "beyond the unverified allegations of the pleadings" or the "motion papers . . . ."  11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 2023); *see Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006).

But for a few reasons, the Defendants are mistaken that the Plaintiffs support their motion with nothing more than unsworn assertions.  First, the Defendants seem to overlook the exhibit attached to the renewed preliminary injunction; though this single exhibit—a flier circulated by officials to notify inmates of their plan to temporarily reopen visitation in December 2022—provides limited information that pertains to only one of the Plaintiffs' several claims.  (ECF No. 49, PageID.291).

Of more importance, the Plaintiffs submitted their motion alongside a verified complaint.  Because parties often have little time to marshal evidence to support or oppose a motion for a preliminary injunction, parties commonly rely on declarations or affidavits, both of which are "appropriate" forms of evidence.  Wright, et al., *supra*, § 2949; *see also Federal Sav. & Loans Ins. Corp. v. Dixon*, 835 F.2d 554, 558 (5th Cir. 1987); 13 Moore's Federal Practice–Civil § 65.23 (Matthew Bender

3d ed. 2023).[3]  But rather than submit a separate affidavit alongside its pleadings, a party may choose to support its position with a set of verified pleadings which functions both as the party's pleadings and as an affidavit or declaration.  *Parke, Davis & Co. v. Amalgamated Health & Drug Plan, Inc.*, 205 F. Supp. 597, 601 (S.D.N.Y. 1962).

So to be "verified," the pleadings must qualify as either an affidavit or a declaration.  To serve as a valid affidavit, the pleadings must "be sworn to" before "an 'officer authorized to administer oaths."  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002) (internal quotation marks omitted) (quoting *Affidavit*, Black's Law Dictionary (5th ed. 1979)).  Alternatively, the pleadings may be considered a declaration if a plaintiff swears to its truth under penalty of perjury in a particular form provided by 28 U.S.C. § 1746(2) (2018).  *Luster v. Macomb Cty. Sherriffs Jail*, No. 06-12273, 2006 WL 3086907, at *2 (E.D. Mich. Oct. 30, 2006).  Unlike affidavits, declarations need not be sworn to be before a notary public.  *See* 28 U.S.C. § 1746.

The complaint here is not notarized and therefore does not qualify as an affidavit.  (ECF No. 50).  It does, however, constitute a declaration.  Section 1746(2)

---

[3] For similar reasons, an affidavit or declaration in support of a motion for a preliminary injunction need not be made on personal knowledge, although the absence of personal knowledge may weaken an affidavit's probative value.  *See Cobell v. Norton*, 391 F.3d 251, 260–61 (D.C. Cir. 2004); *Marshall Durbin Farms, Inc. v. National Farmers Organization, Inc.*, 446 F.2d 353, 357 (5th Cir. 1971).

provides an example of a valid declaration:

> I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
> (Signature).

*Id.* § 1746(2).  A declaration need not recite this example verbatim.  Provided that a declarant signs the declaration, dates the signature, and conveys that the declaration is "true under penalty of perjury," the declaration need only "substantially" follow the statute's template.  *Id.*

Plaintiffs' verified complaint does just that.  Ewing, Littlejohn, Richards, Groom, and one other Plaintiff signed and dated the document.  (ECF No. 50, PageID.307–08).  And while they do not explicitly declare their assertions to be true under penalty of perjury, they close their pleadings by citing "28 U.S.C. § 1746." (*Id.* at PageID.307).  In this context, the Plaintiffs' citation cannot be understood as anything other than a declaration, under penalty of perjury, that their allegations are true and correct.  Why else cite § 1746?  Although the Plaintiffs stray from the statute's model certification, § 1746 cautions Courts not to exalt form over substance: a declaration need only "substantially" follow its example.  28 U.S.C. § 1746.  Because the complaint, in substance, contains all material elements of § 1746, I suggest that it is verified.  *Cf. Downs Law Grp., P.A. v. United States Coast Guard*, No. 21-2407, 2023 WL 4744044, at *7 n.4 (D.D.C. July 25, 2023); *Sanchez v. United States*, No. 3:09cv1330, 2011 WL 1885348, at *4 n.2 (D. Conn. May 18, 2011);

*Alston v. Butkiewicus*, No. 3:09-cv-00207, 2010 WL 1839939, at *1 n.1 (D. Conn. May 7, 2010).  And to shore up any doubt, the Plaintiffs' reply brief clarifies that they cited § 1746 to declare their allegations to be true under penalty of perjury. (ECF No. 114, PageID.602).  Thus, the Court may consider the Plaintiffs' complaint as evidence.[4]

Aside from the verified complaint, Defendants also overlook several declarations attached to the Plaintiffs' original motion.  Many of these declarations contain relevant information and all closely follow § 1746's suggested format.  (ECF No. 8, PageID.76–102).

Still, there are some relevant filings that cannot be construed as evidence.  The renewed preliminary injunction motion (ECF No. 49), for instance, is neither sworn before a notary public nor a proper declaration under § 1746.  Although the document cites § 1746, it does so only to attest that the document has been "serv[ed] on all parties."  (ECF No. 49, PageID.289).

Likewise, the Court cannot consider any evidence introduced in Plaintiffs' reply brief.  Though their brief contains sworn assertions and several exhibits, most of this evidence was not presented until the Plaintiffs filed their reply.  Courts

---

[4] The defendants protest that only Ewing attempted to declare the pleadings to be true under penalty of perjury, arguing that each of the complaint's signatories must have also written similar statements to be considered declarants.  (ECF No. 138, PageID.808).  But even if § 1746 requires all declarants to provide separate certifications, a verified complaint is evidence regardless of whether the document contains one declarant or several.

routinely decline to consider arguments raised for the first time in a party's reply brief because the opposing party generally may not respond to the movant's reply brief. *See e.g.*, *Zak v. Facebook, Inc.*, No. 4:15-cv-13437, 2021 WL 4481352, at *12 n.5 (E.D. Mich. Sept. 30, 2021) (declining to consider an issue raised for the first time at oral arguments); *Sundberg v. Keller Ladder*, 189 F. Supp.2d 671, 682–83 (E.D. Mich. 2002) (declining to consider an issue raised for the first time in a movant's reply brief). *See generally* E.D. Mich. LR 7.1(e). The same is true where a party introduces new exhibits in a reply brief to expand on arguments raised in their initial brief. By withholding exhibits from its principal brief, the movant prevents its opponents from challenging the evidence on which it relies. *Cf. Wallace v. Miller*, No. 09-cv-342-JPG, 2010 WL 4284915, at *2 (S.D. Ill. Oct. 21, 2010); *Charles v. Verhagen*, No. 01-C-253-C, 2002 WL 32360303, at *2 (W.D. Wis. Jan. 28, 2002); *Lorraine Assocs., LLC v. Gov't of the Virgin Islands*, No. ST-15-CCV-438, 2016 WL 1169091, at *4–5 (V.I. Super. Ct. Mar. 18, 2016). Thus, the Court should decline to consider any evidence the Plaintiff withheld until filing their reply brief.

To summarize, while the Court cannot dispose of Plaintiffs' motion on the grounds that they have failed to supply any evidence, it should only take the Plaintiffs' verified complaint, their single exhibit from their principal brief, and their declarations (ECF No. 8, PageID.76–102) into consideration.

## 2.    Outdoor and Indoor Recreation

Plaintiffs first move for an injunction on their claim that the Defendants violated their Constitutional rights by withholding formal periods for both outdoor and indoor recreation in designated facilities.  (ECF No. 49, PageID.285–86, ¶¶ 1–4; ECF No. 50, PageID.298–303, ¶¶ 24–35).  This policy, Plaintiffs argue, deprives them of two overlapping needs: their need for exercise and their need for "fresh air" and sunlight.  (*See* ECF No. 50, PageID.298–303, ¶¶ 24–35).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being."  *Wilson v. Williams*, 961 F.3d 829, 839 (6th Cir. 2020); *see also DeShaney v. Winnebago Cty. Dept. of Soc. Servs.*, 489 U.S. 189, 199–200.  Thus, the state has a duty to provide for an inmate's "basic human needs," including "food, clothing, shelter, medical care, and reasonable safety."  *Deshaney*, 489 U.S. at 200.

When applied to convicted prisoners, this principle follows from the Eighth Amendment's prohibition of "cruel and unusual punishment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  But because the "the state does not acquire the power to punish until" an individual is convicted of a criminal offense, the Eighth Amendment does not apply to pretrial detainees.  *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983); *see also Graham ex rel. Est. of Graham v. County of*

*Washtenaw*, 358 F.3d 377, 382 n.3 (6th Cir. 2004). Still, the Supreme Court has long recognized that the Due Process clause of the Fourteenth Amendment requires the State to house pretrial detainees under humane conditions. *See City of Revere*, 463 U.S. at 244; *see also Griffith v. Franklin Cty.*, 975 F.3d 554, 566 (6th Cir. 2020). Those protections are "at least as" extensive as those provided by the Eighth Amendment. *See City of Revere*, 463 U.S. at 244.

Claims under both Eighth and Fourteenth Amendments consist of an objective component, evaluating the gravity of the deprivation at issue, and a subjective component, assessing the responsible official's mental state. *Greene v. Crawford Cty.*, 22 F.4th 593, 605 (6th Cir. 2022). Courts apply the same objective standard under both Amendments. *See id.* at 605–06. Only deprivations of "necessit[ies] of civilized human existence" are sufficiently serious to violate the Constitution. *Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004). What constitutes a "necessity of civilized human existence" is determined by "contemporary standards of human decency" rather than a court's own "notions of enlightened policy." *Id.* (internal quotation marks omitted) (quoting *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990)). By their nature, prisons are "[h]arsh and uncomfortable," so only "'extreme deprivations'" that deprive inmates of the "'the minimal civilized measure of life's necessities'" violate the Eighth Amendment. *Id.* (first quoting *Hudson v. McMillan*, 503 U.S. 1, 9 (1992); and then quoting *Rhodes v. Chapman*, 452 U.S. 337, 347

(1981)). These "minimal necessities" encompass basic human needs such as adequate medical care, food, shelter, and safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth and Fourteenth Amendments diverge on their subjective components. The Eighth Amendment imposes on prisoners the onerous task of proving that an official "subjectively perceived facts from which to infer substantial risk to the prisoner," that the same official "did in fact draw the inference," and that the official "then disregarded that risk by failing to take reasonable measures to abate it.". *Griffith*, 975 F.3d at 568 (quoting *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018)).

Pretrial detainees must satisfy a far less arduous standard. Under the subjective component, a pretrial detainee must prove "'more than negligence but less than subjective intent—something akin to reckless disregard.'" *Brawner v. Scott Cty.*, 14 F.4th 585, 597 (6th Cir. 2021) (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016)). Put another way, "a plaintiff must prove that the defendant acted "deliberately (not accidentally), [and] also recklessly in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Greene*, 22 F.4th at 606 (quoting *Brawner*, 14 F.4th at 597).

The Sixth Circuit has recognized that under some circumstances, the "denial of" any opportunity for exercise can "rise to the level of an Eighth [or Fourteenth]

16

Amendment violation." *Rodgers v. Jabe*, 43 F.3d 1082, 1086 (6th Cir. 1995). That is because detainees "require regular exercise to maintain reasonably good physical and psychological health." *Patterson v. Mintzes*, 717 F.2d 284, 289 (6th Cir. 1983). Thus, the "near-total deprivation of exercise or recreational opportunity, without penological justification, violates" both the subjective and objective prongs of a detainee's Fourteenth Amendment claim. *Id.* Yet the Court has not established a "minimum amount of exercise required to avoid violating the Constitution." *Rodgers*, 43 F.3d 1082 at 1086. Instead, determining whether a deprivation of exercise is serious enough to implicate the Eighth or Fourteenth Amendments requires a fact-specific inquiry into several factors such as: "the size of the cell, opportunity for contact with other inmates, time per day expended outside the cell, . . . [and] physical or psychological injuries resulting from a lack of exercise or a particularized need for exercise." *See Patterson*, 717 F.2d at 289. And as to the subjective prong, the Sixth Circuit has instructed lower Courts to consider the "justification for denial of the right to exercise." *See id.*

Apart from the right to exercise, the Sixth Circuit has acknowledged that inmates require regular exposure fresh air and sunlight, both of which are "extremely important to the psychological and physical wellbeing of inmates." *See Walker v. Mintzes*, 771 F.2d 920, 924, 927–28 (6th Cir. 1985) (internal quotation marks

omitted) (quoting *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)); *see also*

*Rodgers v. Jabe*, 43 F.3d 1082, 1083, 1086–88 (6th Cir. 1995).[5]

Often, jails simultaneously offer inmates with opportunities for fresh air and

exercise during "yard times" dedicated for outdoor recreation. *See, e.g.*, *Walker*, 771

F.2d at 924. And so an inmate's right to exercise often overlaps with his or her right

to fresh air and sunlight. Like the general right to exercise, the scope of an inmate's

right to outdoor recreation requires a case-specific inquiry into both the extent of any

deprivation and the state's justifications for limiting access to outdoor recreation.

*See id.* at 927–28. Opportunities for indoor recreation and exposure to fresh air and

sunlight through means other than outdoor recreation (for example, by opening

windows) alleviate the severity of restrictions on outdoor recreation. *See Wilson v.*

*Seiter*, 501 U.S. 294, 304–05 (1991).

Despite the fact-specific nature of this right, courts have solidified its outer

bounds. In *Grizzle v. County of San Diego*, for example, the Southern District of

California held an inmate housed in administrative segregation stated a plausible

claim for relief by alleging that officials deprived him of outdoor recreation for eight

months. No. 17-CV-813-JLS, 2018 WL 1603212, at *5–7 (S.D. Cal. Apr. 3, 2018).

---

[5] *Accord Lowe v. Raemisch*, 864 F.3d 1205, 1208-10 (10th Cir. 2017); *Davenport v. DeRobertis*, 844 F.2d 1310 (7th Cir. 1988); *Blake v. Hall*, 668 F.2d 52, 57 (1st Cir. 1981); Spain, 600 F.2d at 199 (collecting cases); *Richard v. Reed*, 49 F. Supp. 2d 485, 487 & n.2 (E.D. Va. 1999).

Although officials did allow the inmate to participate in indoor recreation for "two and a half hours per day," they only offered recreation from one to three in the morning and the dedicated recreation room had "no direct sunlight." *Id.* (citing *Allen v. Sakai*, 203 F.3d 1122, 1133 (9th Cir. 1994) (holding that a prisoner stated a plausible claim for relief by alleging that he had been denied all outdoor exercise for a period of forty-five days). Further, the Court rejected the Jail's argument that allowing outdoor recreation would be impractical because of the Jail's "urban setting," reasoning that it would not be "impossible" for the Jail to provide outdoor recreation and that "[t]he cost or inconvenience of providing adequate [exercise] facilities [ ] is not a defense to the imposition of cruel punishment." *Id.* at *7 (internal quotation marks omitted) (quoting *Spain*, 600 F.2d at 200).[6]

On the other end of the spectrum, the Southern District of Ohio held that a prison did not violate an inmate's Eighth Amendment rights by withholding outdoor recreation for only sixty days as a "disciplinary sanction." *Park v. Morgan*, No. 1:15–cv–182, 2015 WL 1637168, at *3 (S.D. Ohio April 10, 2015). Although the sanction deprived the inmate of "'sunlight' and 'fresh air,'" the inmate did not allege

---

[6] *See also Richard*, 49 F. Supp. 2d at 487 n.2 (explaining that the fictional "captivity of Dr. Alexandre Manette in" Charles Dicken's *A Tale of Two Cities,* where Dr. Manette spent eighteen years in a small cell with essentially no sunlight, would "surely" violate the Constitution).

any facts establishing that he had actually "suffered any physical or psychological injuries" or that the short-lived deprivation either put him at risk of injury. *Id.*

The Defendants here construe the Plaintiffs' claim as a challenge to their opportunities for exercise. (ECF No. 93, PageID.502–04). And if that were indeed all the Plaintiffs alleged, then the Defendants may be correct that the Plaintiffs' prospects of success look bleak. Although the Plaintiffs complain that their cell floors are too dirty for push-ups and that their beds are too unstable for pull-ups, they provide no reason why they cannot perform various other exercises in their cells such as jumping jacks, running in place, squats, or lunges. (ECF No. 50, PageID.301, ¶ 30; ECF No. 114, PageID.611); *cf. Deleon v. Hamilton County Sheriff's Dept.*, No. 1:12-cv-68, 2012 WL 3116280, *17 (E.D. Tenn. Jul. 31, 2012). Lack of creativity does not a constitutional violation make.

But the Plaintiffs do not simply challenge their opportunities for exercise. They challenge the Jail's decision to withhold *outdoor* recreation—not just because the Jail's policy stymied their ability to exercise, but also because outdoor recreation periods were their "only opportunity . . . to get a . . . breath of fresh air . . . ." (ECF No. 50, PageID.299, ¶ 24; *see also* ECF No. 114, PageID.681 (implying that detainees are allowed outdoors during designated "recreation" periods); ECF No. 138-3, PageID.827 (same)). And on this claim, the Plaintiffs are likely to succeed on the merits.

20

Indeed, the record leaves little doubt that the Jail's policy is sufficiently serious to raise constitutional concerns.  The Jail has "suspended all outside and inside recreation" for almost four years with no end in sight.  (ECF No. 50., PageID.298–99, ¶ 24; *see* ECF No. 93-1, PageID.508).  The Plaintiffs' ability to engage in crude, indoor exercise in their cells and the common area does little to ease this lengthy deprivation.  (*See* ECF No. 93-1, PageID.508).  And to exacerbate matters, the Plaintiffs are (or were) housed in Division II of the Jail—a dilapidated, one-hundred-year-old building with "asbestos," "black mold," and airborne "lead paint chippings."  (ECF No. 50, PageID.302, ¶ 33; see ECF No. 114, PageID.649, 651).  Despite these conditions, the Jail does not "open windows" or otherwise provide "proper ventilation."  (ECF No. 50, PageID.302, ¶ 33).  The Defendants do not engage with the Plaintiffs' accusations regarding Division II's air quality in their response brief, and they have ignored the Undersigned's order to provide supplemental briefing on Division II's air quality.  (ECF No. 93, PageID.502–04; ECF No. 93-1, PageID.508, ¶ 5; ECF No. 136; ECF No. 138).  Their refusal to respond to this allegation only bolsters the Plaintiffs' credibility.

The closer question is whether the Defendants' policy is so unjustified that it can be considered "reckless."  *See Brawner*, 14 F.4th at 597.  But here too, Plaintiffs demonstrate a reasonable likelihood of success.  Although the Sheriff's Office may have first implemented its recreation ban to curb the spread of COVID-19, today, it

justifies this policy on the grounds that the Jail is too understaffed to allocate enough personnel to supervise recreation areas. (ECF No. 93, PageID.502–04). The Defendants explain that they can offer recreation no more than one to two times per month, and that allowing recreation without adequate supervision could create "serious security and safety situations . . . ." (*Id.* at PageID.503).

True, understaffing may be a sufficient penological justification for withholding outdoor recreation. But that is only so if the Jail has not recklessly prolonged its staffing shortage. *See Brawner*, 14 F.4th at 597; *Walker*, 771 F.2d at 928. This issue requires an inquiry into the Jail's efforts to hire new personnel and reallocate existing personnel to supervise recreation. Yet the Defendants have supplied little information on these issues so far. (*See, e.g.*, ECF No. 138-3). Further, not all of the Plaintiff's deprivations can be attributed to the Jail's staffing shortage. While the Defendants assert that they are "able to provide" recreation one to two times per month they do not state whether they actually provide recreation this often (despite having been invited to clarify this issue in their supplemental brief), and Ewing asserts that they do not provide recreation even this often. (ECF No. 50, PageID.298–302, ¶¶ 24–35; ECF No. 136, PageID.780 n.2; ECF No. 138). Accordingly, Plaintiffs are likely to satisfy both the subjective and objective components of their claim.

22

Even so, Defendants argue that the Plaintiffs still are not likely to succeed on the merits because they have not violated clearly established law and are therefore shielded by qualified immunity.  (*See* ECF No. 93, PageID.502–04).  Fair enough, although the Sixth Circuit has held that the deprivation of outdoor exercise "can" violate the Eighth Amendment, it has never "endorse[ed]" any specific amount of exercise as a constitutional minimum.  *Rodgers*, 43 F.3d at 1087–88.  But qualified immunity only protects government officials from individual-capacity claims for monetary damages, not official-capacity claims for injunctive relief.  *See United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 484 (6th Cir. 2014); *Cf. Roe v. Adams-Gaston*, No. 2:17-cv-9452018 WL 5306768, at *13 (S.D. Ohio Apr. 17, 2018) (considering a plaintiff's likelihood of success on the merits of her official capacity claims, rather than her individual capacity claims, in assessing her motion for a preliminary injunction).  And even if qualified immunity applied here, any reasonable officer—on the record as it exists today—would recognize that the Defendants' conduct here violates the Plaintiffs' Fourteenth Amendment rights.  The Sixth Circuit, at the very least, recognizes that "restrictions on" outdoor recreation "may violate the Eighth Amendment under some circumstances," and if a four-year deprivation with dubious penological justifications does not offend the Constitution, then it is difficult to imagine what does.  *Rodgers*, 43 F.3d at 1088.  Accordingly, I

suggest that the Plaintiffs have established a strong likelihood of success on the merits.

Still, the Court should be cautious in entering a preliminary injunction. There is no dispute that Division II is currently understaffed, and mandating outdoor recreation with inadequate supervision could create security risks that endanger both inmates and staff. Yet the Jail concedes that it "is able to provide each individual access to the recreation area about 1-2 times per month." (ECF No. 93-1, PageID.508, ¶ 5). Because Plaintiffs assert that the Jail does not provide outdoor recreation as often as it can, I recommend that the Court enter an injunction that would require the Defendants to allow Ewing to engage in outdoor recreation for a two-hour session at least once per month, and if resources allow, officials must permit Ewing to attend two two-hour sessions per month.

### 3.   Visitation

Next, Plaintiffs move for an injunction on their claim that the Defendants violated their right to in-person visitation. Prisoners and pretrial detainees have a constitutional right to in-person visitation. "Prison walls do not form a barrier separating [detainees] from the protections of the Constitution," and restrictions on visitation implicate at least two constitutional protections. *Turner v. Safley*, 482 U.S. 78, 84 (1987). First, detainees have a First Amendment right to "expressive association"; that is, association "for the purpose of engaging in those activities

protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *See Roberts v. United States Jaycees*, 468 U.S. 609, 618–623, (1984); *Bazzetta v. McGinnis*, 286 F.3d 311, 316–17 (citing *Jones v. North Carolina Prisoners' Labor Union Inc.*, 433 U.S. 119, 125 (1977). And second, the Fourteenth Amendment's Due Process clause protects state pretrial detainees' conditions of confinement, ensuring that they receive the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see Overton v. Bazzetta*, 539 U.S. 126, 136–37. In addition, the Supreme Court has recognized that visitation restrictions might also implicate the detainee's substantive due process right to "intimate association" if they interfere with "certain familial relationships," such as those with a detainee's "immediate family." *See id.* at 131 (citing *Roberts*, 468 U.S. at 618–20) (upholding a prison's restriction on visitation because it was reasonably related to a legitimate penological objective without deciding whether a prisoner's right to intimate association "survives incarceration").

Yet none of these protections afford pretrial detainees an absolute right to visitation. No matter its source, "freedom of association is among the rights least compatible with incarceration." *Id.* Indeed, officials may regulate a detainee's rights to expressive or intimate association if the regulation is "reasonably related to legitimate penological interests" and is not an "exaggerated response" to the jail's legitimate penological objectives. *Turner*, 482 U.S. at 87, 89, 90–91; *see Florence*

25

*v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326 (2012) (recognizing that the *Turner* standard applies to pretrial detainees). To determine whether a jail's regulation is "reasonable," courts first determine whether there is a "'valid, rational connection' between the" regulation "and the legitimate governmental interest put forward to justify it." *Id.* at 89–90. If there is no "rational connection," then the regulation cannot be reasonable. *Id.* ("[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational."). If the regulation passes this threshold inquiry, then courts look to three factors to determine whether the regulation nonetheless constitutes an "exaggerated response" to its objectives: (1) "whether there are alternative means of exercising the right that remain open to prison inmates"; (2) "the impact accommodation of the asserted constitutional right" would have on the prison; and (3) "the absence of ready alternatives." *Id.* at 90–91.

A different standard applies to challenges alleging that visitation restrictions deprive inmates of a "necessity of civilized human existence" under the Eighth or Fourteenth Amendments. Again, a pretrial detainee's conditions of confinement offend the Constitution only when the inmate is deprived of "the minimal civilized measure of life's necessities," and officials may be held liable for sufficiently serious deprivations only when they act with "reckless disregard" to an inmate's needs. *Rhodes*, 452 U.S. at 347; *Brawner*, 14 F.4th at 597. Unlike the *Turner* standard

26

applied to expressive and intimate association, this standard does not balance constitutionally protected interests against the "unique circumstances of imprisonment"; it sets a constitutional floor for the conditions of an inmate's confinement and thus requires "full compliance" irrespective of competing penological objectives. *Johnson v. California*, 543 U.S. 499, 511 (2005); *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993). In other words, constitutionally deficient conditions of confinement "are not excused by" a "'reasonable relationship' to a 'legitimate penological goal.'" *Coleman v. Brown*, 28 F. Supp. 3d 1068, 1077 (E.D. Cal. 2014).

Even so, the existence of legitimate penological justifications for depriving an inmate of a "necessity" may be relevant in assessing "whether the adverse treatment is sufficiently gratuitous" under the standard's subjective prong. *Grenning v. Miller–Stout*, 739 F.3d 1235, 1240 (9th Cir.2014) (citing *Rhodes*, 452 U.S. at 346). In the Eighth Amendment context, the requirement that officials act with "deliberate indifference" to a prisoner's needs "follows from the principle that" the Eighth Amendment proscribes "only the unnecessary and wanton infliction of pain"—that is, pain inflicted "totally without penological justification." *Farmer*, 511 U.S. at 834 (citing *Wilson*, 501 U.S. at 297); *Gregg v Georgia*, 428 U.S. 153, 182–83 (1976). Because the state's "responsibility to" provide for prisoners' basic needs "does not ordinally clash with other equally important governmental responsibilities," courts

27

generally need not scrutinize an official's justifications.  *Wilson*, 501 U.S. at 302.

But in the rare circumstances where the provision of an inmate's basic needs does conflict with equally important interests, reasonable efforts to balance prisoners' mutually exclusive needs are not "wanton" or "without penological justification."  *Coleman*, 28 F. Supp. 3d at 1078; *Fisher v. Federal Bureau of Prisons*, No. 4:19-cv-1169, 2022 WL 2648950, at *15 (N.D. Ohio July 8, 2022); *see Overton*, 539 U.S. at 136–37 (upholding a temporary visitation ban partially because it was used "as a regular means of effecting prison discipline" while recognizing that applying the same restriction to "particular inmate" in an "arbitrary manner" may raise constitutional concerns).  So too in the Fourteenth Amendment context, an official does not act with "reckless disregard" to an "unjustifiably high risk of harm" by reasonably balancing competing necessities.  *See Brawner*, 14 F.4th at 597.

The Jail defends its visitation policy here as an attempt to balance two ostensibly clashing needs: detainees' need for human interaction and their need to avoid contagious disease.  (ECF No. 93, PageID.498).  Thus, regardless of which theory the Plaintiffs rely on, the Court must scrutinize both the importance of preventing the spread of COVID-19 relative to the importance of in-person visitation and the Jail's means of accomplishing this goal. [7]  That inquiry requires the Court to

---

[7] *Cf. Watford v. Leabough*, No. 3:20cv676, 2022 WL 363957, at *6, *10 (E.D. Va. Feb. 7, 2022) (scrutinizing a COVID-19 visitation ban under both the First and Eighth Amendments by assessing the policy's penological justifications); *Barasky v. Shoemaker*,

assess several factors: the health risks posed by COVID-19 in light of recent advancements in vaccination, treatment, and potentially widespread natural immunity; the efficacy of the Jail's visitation ban; the availability of alternative means for inmates to communicate with individuals outside of the Jail; and the feasibility of less restrictive alternatives to the Jail's chosen policy, such as requiring personal protective equipment during visitations, enforcing social distancing, or testing visitors for COVID-19. *See Watford*, 2022 WL 363957, at *6, *10.

Yet the Plaintiffs provide little information on these factors, leaving their likelihood of success far from certain. Apart from recognizing that the outside world has abandoned most COVID-19 restrictions, they provide no evidence that the severity of the pandemic has proportionately waned. (*See* ECF No. 50, PageID.299, ¶ 26; *see also* ECF Nos. 49, 114). They present no evidence on the effectiveness of vaccinations, personal protective equipment, or natural immunity. (*See* ECF Nos. 49, 50, 114). Nor do they cite any data indicating that COVID-19's contagiousness or severity has diminished over the last three years. (*See id.*) In fact, the scant information Plaintiffs do provide suggests not only that jails have a higher rate of COVID-19 transmission than the outside world, but that their age, race, and various health conditions place them at a heightened risk of severe infection. (ECF No. 50,

---

No. 1:20-cv-2457, 2021 WL 2255002, at *4–5 (M.D. Pa. June 3, 2021) (same); *see also Vasko v. Amador County Jail*, No. 2:21-cv-1909, 2023 WL 2245709, at *4 (E.D. Cal. Feb. 27, 2023).

PageID.299–300, ¶¶ 27–28).

Further, the Plaintiffs have alternative means of communicating with individuals outside the Jail.  For example, the jail provides electronic tablets capable of video calls, text messaging, and voice calls to inmates.  (ECF No. 93-1, PageID.507–08, ¶ 4).  And as an alternative, inmates at the Jail may communicate with others through "regular telephones" or the postal service.  (*Id.*; *see* ECF No. 50, PageID.304, ¶ 38; ECF No. 114, PageID.624–25, 631).  Not only does the jail's willingness to allow outside communication through means that pose no risk of infection alleviate the visitation ban's burdensome effects, but it also tends to show that the Jail's visitation policy is neither reckless nor an exaggerated response to the pandemic.  *Cf. Vasko*, 2023 WL 2245709, at *4.

True, the Plaintiffs note that the Jail's tablets and regular phones can be costly, with a "fifteen minute in-state phone call" costing over four dollars.  (ECF No. 114, PageID.625).  They also claim that the Jail provides no more than two tablets for every "ten or more" detainees, and these tablets are sometimes hoarded by violent "jail boss[es]."  (*Id.* at PageID.605–06).  But Plaintiffs do not specify precisely how often they can afford to use the tablet service, and they cite only one instance of a violent altercation over the use of a tablet.  (*Id.* at PageID.605–06, 633–35)).  They also do not explain why they cannot anonymously approach jail staff for assistance obtaining tablets that have been hoarded by other inmates.  (ECF Nos. 49, 114).  At

bottom, the Plaintiffs fail to substantiate their assertion that the tablets are, in effect, unavailable for their use.   And even if this point were better supported, "[a]lternatives to visitation need not be ideal . . . they need only be available." *Overton*, 539 U.S. at 135 (rejecting a similar argument that phone calls were "too expensive" a substitute for in-person visitation).  The Plaintiffs have at least some access to the tablet service, and if they cannot utilize the tablets, they can also use regular phones or the postal service.

Finally, to the extent Plaintiffs may seek other alternatives to unrestricted visitation—say, noncontact visitation or mandatory COVID-19 testing—they again provide no evidence to establish whether these measures would be feasible or effective.  (ECF Nos. 49, 50, 114).  In short, the Plaintiffs do not clearly show that they are likely to succeed on the merits because they present too little evidence to establish that the visitation policy is gratuitous.[8]

---

[8] The Plaintiffs argue that the visitation policy is a gratuitous, exaggerated response to the pandemic primarily by identifying perceived inconsistencies in the Jail's COVID-19 policy.  They note, for example that in December 2021, the Jail "[]lifted" its "mask mandate" and other unspecified "COVID protocols" while leaving "all lockdown protocols in place."  (ECF No. 50, PageID.299).  And the following December, the Jail temporarily allowed detainees who were not assigned to "discipline" or "maximum security" three "[thirty] minute visitation[s] . . . with a maximum of two visitors" during the holidays.  (ECF No. 49, PageID.278, 291).  If the Jail can allow visitation for "model inmates" for a "whole month" (or lift its mask mandate), their argument goes, then the Jail can allow visitation for all inmates "every week."  (ECF No. 49, PageID.278).  But the Plaintiffs never explain why the Jail's decisions to lift its mask mandate or allow visitation during the holidays did not jeopardize inmate safety.  And even if these decisions were sound, it still does not follow that the Jail can lift all visitation restrictions just because it could allow a small group of its inmates a temporary, yuletide respite from its normal visitation policy.

Many of these same considerations also tip the balance of the equities against the issuance of an injunction. Although the blanket visitation ban imposes a significant hardship on the Jail's detainees, the plaintiff's confinement is inherently short-term, and the only two Plaintiffs who remain in the Jail will most likely be released soon. (ECF No. 138, PageID.806 (citing ECF No. 138-1, PageID.818, 821)). Until then, these two Plaintiffs have alternative means through which they can communicate with the outside world. On the other side of the equation, the Jail's visitation policy is intended to protect detainees from a serious public health concern. While policy might go much farther than necessary to protect its detainees from COVID-19, the record remains too bare for the Court to assess whether policy is so overbroad that it violates *Turner* and *Brawner*'s deferential standards. *See Turner*, 482 U.S. at 89–91; *Greene v. Crawford Cty.*, 22 F.4th 593, 605–07 (6th Cir. Jan. 4, 2022) (citing *Brawner*, 14 F.4th at 597). Given this dearth of evidence, the Court should defer to the judgment of jail officials. *See Turner*, 482 U.S. at 84–85.

None of that, of course, should be construed to mean that the Plaintiffs have no chance of prevailing on this claim. Through discovery, Plaintiffs may uncover evidence that controlling COVID-19 by banning all visitation is like taking a sledgehammer to a mosquito. But for now, with a record too bare and risks too

---

There is a stark difference between completely reopening visitation and temporarily allowing some inmates a few visitations each during a three-week period.

uncertain, the Court should not enter an injunction.

### 4.    Incoming Mail

Plaintiffs next move for a preliminary injunction on their claim that prison officials violated their First Amendment rights by "stockpil[ing] incoming" books and mail "for months at a time" and sometimes returning incoming mail "back to sender" without notifying its intended recipient.  (ECF No. 50, PageID.304, ¶ 39). Like the Plaintiff's right to visitation, the First Amendment protects both the sender and recipient of "direct personal correspondence" from "unjustified" government interference with their communication.  *Simpson v. County of Cape Girdeau*, 202 F. Supp. 3d 1062, 1067 (E.D. Mo. 2016) (citing *Procunier v. Martinez*, 416 U.S. 396, 408–09 (1974) (*overruled in part by Thornburgh v. Abbott*, 490 U.S. 401 (1989)). Here too, officials may restrict the Plaintiffs' First Amendment right to incoming mail if the restriction is "reasonably related to legitimate penological interests" and is not an "exaggerated response" to the jail's penological objectives.  *Turner*, 482 U.S. at 87, 89–91.

When officials reject an incoming letter, rather than merely delay its receipt, they must notify the intended recipient, provide "the author of that letter . . . a reasonable opportunity to protest [the] decision," and refer any complaints "to a prison official other than the person who originally disapproved the correspondence."  *Procunier v. Martinez*, 416 U.S. 396, 417–18 (1974) (overruled

on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)).[9]  These procedural safeguards are mandatory regardless of whether jail may lawfully reject the mail at issue.  *See Martin*, 803 F.2d at 243–44 (reasoning that the procedural safeguards required by *Martinez* do not "merely" provide a remedy when officials actually infringe on an inmate's First Amendment rights—they serve as prophylactic measures, allowing inmates to verify the rationale behind each rejection).

Although the Plaintiffs cite several examples of interference with their incoming mail, their slipshod briefing prevents the Court from properly considering most of their evidence.  In their verified complaint, the Plaintiffs describe the jail's practices with very little detail, broadly accusing the Defendants of "stockpil[ing]" incoming mail "for months at a time" and "at times" returning incoming mail to its sender without notice to the intended recipient.  (ECF No. 50, PageID.304, ¶ 39).  Only in their principal brief to their renewed motion for a preliminary injunction do the Plaintiffs cite any examples of interference, explaining that they do not "receive

---

[9] Jail officials must provide authors of rejected mail an opportunity to protest their decision for two reasons.  First, censorship of a detainees' mail implicates the First Amendment rights of not only the intended detainee-recipient, but also the sender.  *Martin v. Kelley*, 803 F.2d 236, 243–44 (6th Cir.1986).  And second, because the intended "inmate-recipient would not have seen the contents of the withheld letter, he may require the aid of the author to meaningfully challenge the rejection."  *Id.* at 244.  Yet while the Sixth Circuit has recognized that there may be little benefit in allowing a detainee to challenge a decision to censor incoming mail, the Court yet to decide whether a policy allowing *only* the author of a censored letter to contest the jail's decision would sufficiently protect the detainee's right to due process.  *See id.*; *see also ACLU v. Livingston Cty.*, 796 F.3d 636, 648–49 (6th Cir. Aug. 11, 2015).

Christmas cards" until "Valentine's Day or later."  (ECF No. 49, PageID.287, ¶ 6).  But as explained above, Plaintiffs' brief in support of their renewed motion for a preliminary injunction is not evidence because it is unverified, and this assertion is unaccompanied by any supporting exhibits.

Most of the Plaintiffs' evidence can only be found in their reply brief.  There, the Plaintiffs reassert their allegation that they do not receive Christmas cards until well into the new year—this time under penalty of perjury.  (ECF No. 114, PageID.616–17, 619).  They also describe an instance where the Jail prevented Ewing from receiving "three" letters from his counsel in a separate, civil matter "in a timely fashion."  (*Id.* at PageID.617–18).  Further, the Plaintiffs attach a news article which accuses jail officials of returning a letter sent to one of its detainees under the mistaken belief that the detainee "d[id] not live [t]here."  (*Id.* at PageID.617, 686).  In none of these examples do the Plaintiffs clarify whether the Jail notified the author or intended recipient of its decision to deny or delay delivery.  (*Id.* at PageID.616–18).

Yet the Court cannot consider any of this evidence because, as explained above, it is presented for the first time in the Plaintiffs' reply brief.  As a result, Plaintiffs' general assertions in their verified complaint—and the Court's own observation that the Jail has returned several orders addressed to Kirksey as undeliverable even though he remains in the Jail's custody—are the only evidence

of interference with the Plaintiff's incoming mail that the Court may consider.  (ECF No. 137, PageID.788; *see, e.g.*, ECF Nos. 32, 38, 44, 104).

But with such scant evidence, the Plaintiffs fall short of demonstrating that they are likely to succeed on the merits.  The Plaintiffs' broad allegations do not contain concrete examples of interference, lay out the exact scope and frequency of interference, or supply any affidavits from detainees with personal knowledge of the Jail's unlawful practices.  (ECF No. 50, PageID.304, ¶ 39).  And while the Jail has returned some letters mailed to Kirksey as undeliverable, the Plaintiffs with current addresses have, for the most part, responded to the Court orders and the Defendants' motions in a timely manner, indicating that they have received these documents promptly.  (*See, e.g.*, ECF Nos. 49, 91, 95–98).  Further, the Defendants have provided an affidavit from a deputy chief responsible for supervising Division II, stating that she is unaware of any "current issues with the processing and delivery of mail to those incarcerated in Divisions I or II" of the Jail.  (ECF No. 93-1, PageID.507, ¶ 2).  At bottom, it is not clear that there are any issues with the delivery of incoming mail, and if there are, these issues appear to be sporadic.  Accordingly, I suggest there is too little evidence of either delayed delivery or unnotified censorship to show that Plaintiffs are likely to succeed on the merits of their claims.[10]

---

[10] To the extent Plaintiffs accuse the Jail of interfering with their receipt of legal mail—whether by delaying delivery or returning mail to sender without notice—their allegations also implicate their right to access the courts.  *See Swekel v. City of River Rouge*, 119 F.3d

Even if the Plaintiffs had shown that officials substantially delayed the receipt of their mail or withheld their mail without notice, the Defendants' interference with the Plaintiffs' First Amendment interests may reasonably further legitimate penological objectives. *See Turner*, 482 U.S. at 87, 89–91. True, the Defendants simply deny any issues concerning the "processing and delivery" of incoming mail without raising any alternative arguments to justify the alleged delays or procedural inadequacies. (ECF No. 93, PageID.500–02). But even so, the record contains evidence suggesting that there may be valid penological justifications for at least some of the Jail's missteps. Indeed, jails must implement some measures for screening incoming mail. That is because incoming mail provides inmates an opportunity to smuggle weapons or narcotics into the jail, and correspondences may contain surreptitious messages containing information that could threaten prison security, such as "escape plans" or "information regarding other inmates." *Simpson v. County of Cape Girdeau*, 202 F. Supp. 3d 1062, 1069 (E.D. Mo. 2016); *Covell v. Arpaio*, 662 F. Supp. 2d 1146, 1149, 1153 (D. Ariz. 2009).

---

1259, 1262 (6th Cir. 1997). To prevail on "access to the courts claim," inmates must show that the jail's actions "frustrate[d]" their efforts to "meaningful[ly]" pursue a claim. *Lewis v. Casey*, 518 U.S. 343, 351–53 (1996). Yet the Plaintiffs provide no evidence that the jail's practices stymied their efforts to pursue a claim except to argue that the Jail's practices may have put Kirksey at risk of dismissal for failure to prosecute. (ECF No. 114, PageID.817). But as explained in the Undersigned's December 20 Report and Recommendation, Kirksey has not failed to prosecute his claims and he almost certainly will not be dismissed from this action. (ECF No. 137, PageID.788).

Those measures, of course, necessarily delay the delivery of outside mail. *See Cotton v. Schotten*, No. 95-4085, 1997 WL 299386, at *1 (6th Cir. June 4, 1997) ("[S]hort, non-content based delays in prison mail are not unreasonable . . . ."). And here, the Plaintiffs concede that officials attribute the Jail's shortcomings to a "backlogged" mail room. (ECF No. 50, PageID.304, ¶ 39). Thus, many of the delays and errors processing inmate mail may be the result of the Jail employing too few officials to screen inmate mail for threats to jail security in a timely manner. (*See id.*) And nothing in the record suggests that the Jail can either reduce the volume of mail it receives or dedicate additional labor to its mail room.

To be sure, it remains possible that not all delays or mistakes processing inmate mail can be attributed to officials' efforts to screen mail. But the record does not contain enough information for the Court to narrowly craft an injunction such that it would expedite delivery of incoming mail without requiring officials to cut corners screening mail in an already flooded mail room. *See Prison Legal News v. Bezotte*, 11-CV-13460, 2013 WL 1316714, at *6 (E.D. Mich. Mar. 29, 2013) ("The Court should be slow to dismantle prison regulations absent a showing that it is absolutely necessary."). In other words, without knowing how much of the Jail's alleged shortcomings stem from the Jail's screening process, any injunction might compromise jail officials' ability to effectively screen incoming mail, putting the safety of all detainees at risk. For these reasons, I recommend that the Court deny

preliminary injunctive relief on Plaintiffs' claims concerning the delivery of outside mail.

### 5.      Priority Mail and Copying Legal Materials

That leaves just two claims for which the Plaintiffs seek preliminary injunctive relief.   First, they claim that officials "copy and store" their "legal materials."  (ECF No. 50, PageID.305, ¶ 40).  And second, they accuse officials of interfering with their right to access the courts by refusing to subsidize "priority mail" for "indigent" detainees.  (*Id.* at PageID.305, ¶ 42).

The Plaintiffs make little effort to substantiate their claims.  In consequence, their probability of success on these claims is too uncertain for the Court to enter an injunction.   Like their claims regarding the Jail's incoming mail practices, the Plaintiffs discuss their claims in little detail, relying on generalized and conclusory accusations of wrongdoing. *Cf. SEC v. General Securities Co.*, 216 F. Supp. 350 (S.D.N.Y. 1963).  Further, their broad allegations also obscure the extent to which their allegations are supported by personal knowledge.  *See Cobell*, 391 F.3d at 260–61.  Thus, I suggest that the Plaintiffs have not clearly shown that an injunction is warranted on either claim.

### C.      Conclusion

For these reasons, **I RECOMMEND** that the Court **GRANT** Plaintiffs' motion for a preliminary injunction (ECF No. 49) **IN PART** and **DENY** Plaintiff Ewing's Motion to Expedite (ECF No. 134) **AS MOOT**.

## III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 17, 2024                           S/PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge